IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY C. BOLES | ) | |
| | ) | |
| v. | ) | No. 2:12-0079 |
| | ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION | ) | |

To: The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for disability insurance benefits and supplemental security income, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 15), to which defendant has responded (Docket Entry No. 17). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 11),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I. Introduction

Plaintiff protectively filed for disability benefits on October 5, 2009, alleging an onset of disability as of December 31, 2005, due to hepatitis C, left knee problems, foot

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

problems, bad back, obesity, right arm problems, liver problems, and a broken pelvis. (Tr. 164) Plaintiff's claims were denied initially and upon reconsideration, whereupon plaintiff requested de novo hearing of her claims by an Administrative Law Judge (ALJ). The hearing was convened on May 31, 2011, and plaintiff appeared with counsel and gave testimony, as did an impartial vocational expert whose services were paid for by the government. (Tr. 27-55) During the hearing, plaintiff amended his alleged onset date from December 31, 2005, to December 31, 2007. (Tr. 31) At the conclusion of the hearing, the ALJ took the matter under advisement until July 13, 2011, when he issued a written decision in which he found plaintiff to be not disabled. (Tr. 10-22) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.

2. The claimant has not engaged in substantial gainful activity since December 31, 2007, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Hepatitis C; partial amputation of right little finger; history of fractured pelvis; back impairment; right knee impairment; right arm/elbow impairment; lower extremity edema; hypertension; morbid obesity; depressive disorder; generalized anxiety disorder; and history of narcotic addiction in self-reported remission (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he would be limited to standing

or walking a total of 2 hours in an 8-hour workday, and sitting a total of 6 hours in an 8-hour workday. In addition, he maintains the ability to interact superficially with others appropriately, but not intensely.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June 30, 1970 and was 37 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-17, 20-21)

On June 14, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following summary of the record is taken from defendant's brief, Docket Entry No. 17 at 3-13.

**1. Non-Medical and Vocational Evidence**

As of December 31, 2007, Plaintiff's amended alleged onset date, he was 37 years of age and he was under 50 years of age at all relevant times in this case, which means he is a "younger individual" (Tr. 120, 128). See 20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.00(h)(1). Plaintiff completed schooling through the 12th grade in regular education classes and can read and write (Tr. 170, 418).

**2. Medical Evidence**

   a. Physical Health

On May 2, 1993, Dr. Carl M. Hollmann noted that Plaintiff ran his truck off the road and was thrown from the vehicle fracturing his left pelvic bone after consuming "eight or nine beers" (Tr. 259–60). Dr. Hollmann noted that Plaintiff had his right "pinky" finger amputated after catching it between the wheels of a machine at his workplace, Russell Stover's, on October 22, 1998 (Tr. 250–52). On February 3, 2005, Dr. S. McLerran noted that while Plaintiff was hunting with a dog, the dog jerked and caused him to fall four or five feet down a hill, which resulted in a traumatic right knee effusion (Tr. 281–84). Dr. McLerran noted that he is no longer in outpatient therapy for narcotics and noted "huge Narcotics addiction" (Tr. 284). Plaintiff's weight was 240 pounds (Tr. 284).

On a June 13, 2007, nursing assistant R. Henry from Overton County Health Department (OCHD) noted Plaintiff's report that he had been going to a methadone clinic since November 2006 for past intravenous (IV) drug use and pain control (Tr. 361). He

reported fatigue and swelling in his feet (Tr. 361). An A.P.N. (advance practice nurse) at OCHD assessed Plaintiff with hepatitis C, hypertension, drug dependence, edema (swelling from fluid), and a history of elevated glucose (Tr. 361). On August 30, 2007, Plaintiff's weighed 298.6 pounds (Tr. 362). On March 13, 2008, he weighed 334.6 pounds (Tr. 358). By March 20, 2008, Plaintiff's weight had increased to 328.6 pounds (Tr. 359). Plaintiff continued treatment at OCHD throughout 2008 and 2009 for hepatitis C, morbid obesity, hypertension, and high blood cholesterol (Tr. 314–15, 333–60).

At the request of the Tennessee Disability Determination Service (DDS), Plaintiff attended a consultative exam (CE) by Dr. Donita Keown on January 27, 2010 (Tr. 370–79). Dr. Keown noted Plaintiff's reports of "tiredness" (Tr. 370). He denied having had a biopsy, hospital stays, or treatment for his hepatitis C. Id. Dr. Keown also noted Plaintiff's reports of bilateral knee pain, particularly in his left knee (Tr. 370). He complained of popping, grinding, and discomfort, and reported that he began using a wooden stick that he fashioned into a cane in July 2009 for ambulation (Tr. 370). Plaintiff also reported swelling in his ankles, particularly his left ankle (Tr. 370). Dr. Keown opined, "With regard to back pain, [Plaintiff] had little to say" (Tr. 370).

Plaintiff's height was recorded as 69 inches (or 5'9") and, because he exceeded the 350-pound limit on her scale, Dr. Keown estimated his weight as between 350–400 pounds (Tr. 371). She described Plaintiff's cane as "a piece of wood that has been curved," and noted that it was not a medical device (Tr. 370). She specifically noted that Plaintiff did "not state with clarity if the device was prescribed by a physician" and that he was "[a]mbulatory with or without the piece of wood" (Tr. 370–71). Dr. Keown diagnosed bilateral pedal edema, particularly on the left (Tr. 371).

5

Musculoskeletal exam notes indicate:

Shoulders forward elevate and abduct to 160 degrees [normal abduction is 0–170 degrees]. Elbows flex and extend 116 and 0 degrees [normal flexion is 0–140 degrees; normal extension is 0–0 degrees]. Wrist joints, dorsiflex, palmar flex 70 degrees[normal dorsiflexion and palmar flexion are 0–60 degrees]. Digits flex and extend fully at the MCP [metacarpophalangeal joint], PIP [proximal interphalangeal joint], and DIP [distal interphalangeal joint] joints. There has been amputation of the fifth digit of the right hand and its most proximal joint. The distal interphalangeal joint of the right thumb flexed 55 degrees and extended 0 degree [normal flexion for thumb interphalangeal joint is 0–80 degrees, normal extension is 10–0 degrees]. No joint swelling, warmth, or atrophy. He has a large irregular appearing scar over the right forearm consistent with a laceration he suffered in the remote past. The claimant showed full range of motion n[sic] the digits of the left hand.

Lower extremity exam is difficulty [sic]. The claimant's legs are heavy. He is no providing liable efforts [sic]. It is noted that the left and right knees are flexed at 90 degrees when seated in the chair discussing various problems then when the claimant was asked to flex and extend at the knee joints, he exhibits flexion on the right 80 degrees, extension 0 degrees, flexion on the left 45 degrees and extension 0 degrees [normal flexion is 0–150 degrees, normal extension is 0–0 degrees]. Left and right knee joints, neither swollen, red, or warm. I do not appreciate crepitance [grinding/rubbing], effusion [fluid buildup], redness, or warmth. Ankles dorsiflex and plantarflex 20 and 40 degrees [normal dorsiflexion is 0–20 degrees, normal plantar flexion is 0–40 degrees].

(Tr. 372).

Dr. Keown noted that Plaintiff's "[c]ervical spine rotation right and left full, flexion and extension full" (Tr. 372). She opined that his thoracolumbar column "[m]ovements were smooth and swift to dorsiflexion 90 degrees [normal forward flexion from hip is 0–90 degrees]. Left and right lateral function is 30 degrees [normal flexion 0–25 degrees], SLRs [straight leg raising] negative" (Tr. 372). Dr. Keown opined that in addition to being able to ambulate without his stick, Plaintiff showed no difficulty getting up from a chair, but she did not conduct a further evaluation of Plaintiff's gait and stations (Tr. 372). Ultimately, Dr. Keown opined:

1. Hepatitis C by history without evidence of end-stage liver disease or portal hypertension.
2. Bilateral knee pain, it is likely attributable to degenerative disease in light of his weight and complaints; however, objective evidence for pathology not observed.
3. Chronic low back pain.
4. Remote history of right arm laceration, remote history of digit five distal amputation.
5. Remote history of pelvic fracture with occasional aching pain.
6. Hypertension, not well controlled since the compliance issues based on medical records reviewed.

(Tr. 372).

Dr. Keown noted that she had reviewed Plaintiff's notes from OCHD, where he had been seen within the last 30 days (Tr. 370). She opined that Plaintiff could lift 100 pounds occasionally and 50 pounds frequently, and could carry 50 pounds occasionally and 20 pounds frequently (Tr. 374). She opined that he could sit for 2 hours, stand for one hour, and walk for 45 minutes without interruption, and that in an 8-hour workday, he could sit for 8 hours, stand for 7 hours, and walk for 6 hours (Tr. 375). She added that he could occasionally kneel, crouch, crawl, or climb stairs, ramps, ladders, or scaffolds, and that he could frequently stoop (Tr. 376) She noted that he did not require a cane to ambulate (Tr. 375).

On March 29, 2010, Dr. Glenn James, a State agency medical consultant, completed a Physical Residual Functional Capacity (RFC) Assessment form noting that his RFC reflected Dr. Keown's medical examining source opinion, a "[questionable] effort with [range of motion (ROM)] for knees was better while sitting," and that symptoms are credible (Tr. 394–401). Accordingly, he opined Plaintiff was capable of occasionally lifting or carrying 20 pounds and frequently lifting or carrying 10 pounds; he can occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, stoop, kneel, crouch, and crawl (Tr. 395). He opined that Plaintiff was capable of sitting, standing, or walking for up to 6 hours in an 8-hour

workday (Tr. 395). On July 21, 2010, Dr. J. Rogers, also a State agency medical consultant, reviewed Plaintiff's records, completed a case analysis form, and concurred with Dr. James's RFC assessment (Tr. 411). On July 22, 2010, Dr. Calvin Jones, another State agency medical consultant, reviewed Plaintiff's records and concurred with Dr. James's RFC (Tr. 58, 412).

In his Disability Report, Plaintiff indicated that Dr. Michael Cox, a doctor at the Livingston Clinic, had been one of his primary care physicians from 2000 onwards (Tr. 167, 297, 300–03). The records show that Plaintiff sought treatment for chest congestion and his head being "stopped up," as well as sleep problems (Tr. 300, 302-03). Dr. Cox prescribed Ambien and "Super D's" for Plaintiff (Tr. 297, 300).

On May 23, 2011, at the request of Plaintiff's attorney, Dr. Cox, an internal medicine specialist, examined the Plaintiff to assess his functional capacity (Tr. 482–87). He noted that Plaintiff "did not require orthopedic appliances for ambulation" (Tr. 486). Dr. Cox noted that Plaintiff's weight increased from 180 to 376 pounds, and opined that his weight gain along with his lower back and foot pain "have caused him to be unable to ambulate well, stand on his feet and care for himself" (Tr. 486). He observed that as to Plaintiff's lumbar spine, Plaintiff could flex activity 85 degrees (normal forward flexion from hip is 0–90 degrees), extend 5 degrees (normal range for extension is 0–25 degrees), left lateral flex 10 degrees and right lateral flex 10 degrees (normal range for lateral flexion is 0–25 degrees) (Tr. 486). He noted that Plaintiff had difficulty turning his feet inward and could not rotate them internally at all, but had normal external rotation (Tr. 486). He noted that Plaintiff's left foot was "somewhat swollen" and that it "appear[ed] to have a fallen arch" (Tr. 486). However, he noted that Plaintiff's extremities were not edematous (swollen with fluid), and that his joints were free of any redness, warmth, synovitis (inflammation of a synovial membrane), or

effusion (Tr. 486). Dr. Cox opined that the range of motion of all joints was normal other than the lumbar spine (Tr. 486).

Ultimately, Dr. Cox opined that Plaintiff could lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; Plaintiff was limited to standing or walking for less than 2 hours, and sitting less than 6 hours in an 8-hour day (Tr. 482). Dr. Cox explained that Plaintiff's "lower back pain and [left] foot keep him from being able to do above activities" (Tr. 483).

### b. Mental Health

Plaintiff entered drug rehabilitation at Volunteer Health Care System on August 30, 2004, and discharged on December 15, 2004, where Dr. Roy Anderson diagnosed him with alcohol dependence and opioid dependence on Axis I (Tr. 490–92). On October 19, 2009, Plaintiff sought treatment at Private Clinic North for treatment for his drug addiction, where he was placed on 120 mg of methadone (Tr. 414–25, 578–83). On September 4, 2010, Plaintiff reported to Ken Strickland, B.S., C.A.S., that he had gone on a fishing trip with friends (Tr. 429). On September 17, 2010, Plaintiff's GC/MS drug test returned positive for benzodiazepine substances (Valium and Serax) (Tr. 428). The last noted counseling session is noted as September 29, 2010 (Tr. 428). In his psycho-social assessment form, Plaintiff noted that his hobbies included hunting, fishing, boating, and using off-road vehicles (Tr. 418). For his current employment status, he answered "Part-time" and for his current occupation, he answered "work odd jobs for myself" (Tr. 419).

Dr. George W. Livingston, a State agency psychological consultant, completed a Psychiatric Review Technique form (PRTF) and a Mental Residual Functional Capacity form (MRFC) dated February 11, 2010, opining that Plaintiff did not meet the diagnostic criteria

for any medically determinable mental impairments and did not meet or medically equal any impairment listed under § 12.00 in the Listing of Impairments, 20 C.F.R., Subpart P, Appendix 1 (the Listings) (Tr. 380–92).

On May 26, 2010, at the request of the state DDS, Mark Loftis, M.A., LSPE, performed a CE and diagnosed Plaintiff with opiate dependence and depressive disorder, nos (Tr. 404-08). He opined that Plaintiff was mildly impaired in the areas of "[u]nderstanding and remembering" and "[c]oncentration, persistence and pace;" and moderately limited in "social interaction skills necessary to deal with coworkers and supervisors" and his "ability to adapt to changes found in most work situations" (Tr. 407).

On June 22, 2010, State agency psychological consultant Dr. Mason D. Currey reviewed Plaintiff's records, reviewed Dr. Livingston's PRTF and MRFC findings and affirmed Dr. Livingston's opinion (Tr. 409).

At an April 19, 2011 appointment at the OCHD, Plaintiff reported being depressed over the past two months, and he was given a prescription for fluoxetine, also known as Prozac (Tr. 469–70). On May 19, 2011, Plaintiff was assessed by Dr. Donald Atkinson for treatment for depression and anxiety at Volunteer Behavioral Health Care system (Tr. 474-75). Plaintiff was diagnosed with major depressive disorder, single episode, severe without psychotic features; generalized anxiety disorder; and alcohol and opioid dependence (Tr. 474–75).

### 3. May 31, 2011 Hearing Testimony

Plaintiff testified that he is 5'10" and that he currently weighed 395 to 398 pounds (Tr. 32). He testified that, in the past, he weighed around 180 to 200 pounds, but that over the past five years his weight had increased (Tr. 32). Since his alleged disability onset date of

December 31, 2007, he attempted to return to work in the form of a three-day stint at "Hutchinson's" (apparently as a "laborer"—see Tr. 174) in August 2009 (Tr. 33). Leading up to December 2007, he had worked at Citgo as a cashier, cook, and stocker (Tr. 31, 33). Prior to that, he worked as a mason's helper from 2005 to 2006, which required him to lift heavy block and brick, run a mud machine, and set up and take down scaffolding (Tr. 33).

Plaintiff testified that he experienced lower back pain "generally, all the time" (Tr. 39). He also testified that he could not stand on his left foot because "it swells up and there is so much pain in it" (Tr. 40). He stated that his lower back pain had caused him to leave his job as a mason's helper, because he "got to where [he] couldn't lift" (Tr. 37). He added that his foot pain was the reason he was not able to keep working at Hutchinson's (Tr. 40). Plaintiff testified that he received medical care through the Health Department because he did not have insurance or the money to see a private doctor (Tr. 39). Plaintiff added that someone from the Health Department had instructed him to walk with a cane to alleviate his back pain. Id. He stated that if he walked for any length of time without his cane, his back would hurt, and that the pain prevented him from walking long distances without stopping or sitting down. Id. He further testified that his back pain prevented him from sleeping well and that 4–5 nights a week he would have to move from his bed to a recliner. Id. Aside from his alleged back and foot pain, Plaintiff testified that he experienced pain in his right arm that prevented him from using it to lift and abdominal pain when bending over (Tr. 41, 44). Plaintiff also testified that his gripping abilities were limited due to his 1998 finger amputation (Tr. 44–45).

When asked about his daily activities, Plaintiff testified that he typically read, watched television shows such as "The Price Is Right," and browsed the internet particularly

11

for news stories (Tr. 42). He denied doing any housework, but said that he could drive four or five miles (Tr. 43). He stated that could ride in a car with his friend to a methadone clinic in Roseville, but his back pain would require them to stop two or three times to stretch (Tr. 43). Plaintiff testified that due to his back and foot pain, he could only stand about ten minutes before having to sit down, and that he could not walk 35 or 40 yards without having to stop and rest (Tr. 45). Plaintiff acknowledged that he had been addicted to pain killers and he has been in methadone treatment at a clinic since October 2006 (Tr. 37–38). He stated that the methadone slightly helped his pain but that he did not take any pain medication other than over-the-counter medicine (Tr. 39, 49–50).

Vocational expert (VE), Katharine Bradford, testified that Plaintiff has past relevant work (PRW) as a production packager (medium and unskilled), mason's helper (heavy and semiskilled), cashier (light and semiskilled), welder/production line (medium and unskilled), candy-maker (medium and skilled), foam cutter (medium and unskilled), and furniture assembler (medium and unskilled) (Tr. 52). The ALJ posed the following hypothetical:

> If you will assume an individual, who is classified as a younger individual, almost 40-years of age. He has a high school education and past relevant work identical to that of the claimant. Assume this individual is limited to light exertion. They can stand or walk a total of two hours per day and sit a total of six to eight hours per day. Assume that he can interact with others professionally, but not intensely.

(Tr. 52–53). The VE testified that such an individual could perform representative light occupations such as machine tender (800 positions in the state, 38,000 nationally), inspector (500 positions in the state, 27,000 nationally), and assembler (1,200 positions in the state, 48,000 nationally). The VE testified that if the hypothetical person were required to use a cane when he stood, it would eliminate these positions (Tr. 53–54). The VE also testified that

12

if the hypothetical person were limited to standing less than 2 hours and sitting less than 6 in an 8-hour day, it would preclude competitive employment (Tr. 54).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at §

423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications

to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in rejecting the opinion of treating physician Dr. Michael Cox; in discounting the weight of plaintiff's subjective pain complaints; and, in failing to properly consider plaintiff's morbid obesity. The first and third of these arguments are linked together due to the emphasis placed on plaintiff's obesity by Dr. Cox in his assessment of work restrictions. Specifically, Dr. Cox opined that plaintiff's morbid obesity, lower back pain, and pain in his left foot combine to preclude lifting and carrying more than ten pounds, and leave him unable to sit for as many as six hours, and to stand/walk for as many as two hours, during the eight-hour workday. (Tr. 482-83) The ALJ found plaintiff's obesity to be a severe impairment (Tr. 15), and stated that he had considered "the impact obesity has on limitation of function including the claimant's ability to perform routine movement and necessary physical activity within the working environment" (Tr. 18), but did not specifically identify any work-related limitations that were attributable to plaintiff's obesity or to other impairments or symptoms which were exacerbated by his

15

obesity. He thus failed to observe the requirement of Social Security Ruling 02-1p, that he "explain how [h]e reached [his] conclusions on whether obesity caused any physical or mental limitations." 2000 WL 628049, at *7.

However, while the ALJ rejected the conservative assessment of Dr. Cox because, e.g., it was inconsistent with the other assessments of record and Dr. Cox's own minimal clinical findings, he nonetheless found that plaintiff was "limited to standing or walking a total of 2 hours in an 8-hour workday[.]" (Tr. 17) This finding, while not perfectly aligned with Dr. Cox's assessment of plaintiff's ability to stand/walk "less than 2 hours in an 8-hour workday" (Tr. 482), is itself inconsistent with the other, less conservative medical opinions of record which the ALJ credited. Notably, Dr. Cox explicitly assessed plaintiff's limitations in light of his obesity (Tr. 483), while the other examining source of record, Dr. Keown, explicitly did not consider plaintiff's obesity in her assessment of plaintiff's functional limitations (Tr. 374). Dr. Keown did account for bilateral knee and lower back pain in her assessment, and further observed bilateral pedal edema (all of which are referenced in the ALJ's finding of plaintiff's severe impairments (Tr. 15)), but still found that plaintiff could lift/carry up to 50 pounds occasionally and could stand/walk for 6-7 hours out of the workday. (Tr. 374-75) Inasmuch as the ALJ otherwise accepted Dr. Keown's assessment "because [it is] supported by medical signs and clinical findings" (Tr. 18), but did not adopt her conclusions -- reached without considering plaintiff's body habitus -- as to plaintiff's exertional abilities, it is apparent that the ALJ's assessment of plaintiff's restriction to standing/walking only two hours per day and lifting/carrying only 20 pounds occasionally and 10 pounds frequently represents his implicit accreditation of the impact of plaintiff's morbid obesity and its sequelae on his ability to perform weight-bearing activities.

16

Therefore, any error in the ALJ's failure to explain his conclusions with regard to obesity is rendered harmless.

As to the rejection of Dr. Cox's assessment of plaintiff's work-related limitations, plaintiff alleges error because the treating physician's opinion is sufficiently supported by medical findings to be entitled to substantial deference. (Docket Entry No. 16 at 20) (citing, e.g., Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004)). The ALJ explained his consideration of Dr. Cox's opinion as follows:

> The undersigned has considered the determination of Dr. Cox. However, I find this assessment over-restrictive and inconsistent with the record. While Dr. Cox does have a treating relationship with the claimant, the treatment history of record is notably brief. Even Dr. Cox noted the claimant does not require a cane to walk. He observed no sensory, motor, or other neurological deficits. All joints had full range of motion except the lumbar spine, but this is subject to voluntary control and a symptom rather than an objective sign. Dr. Cox noted no redness, warmth, synovitis or effusion of his joints. Dr. Cox, however, did note evidence of an apparent fallen arch of the left foot with swelling. Given the minimal clinical findings by Dr. Cox, the absence of aggressive treatment, and the more specific and consistent findings of the other physicians, I do not accord much weight to his very conservative assessment of the claimant's RFC.

(Tr. 19) In view of this reasoning, as well as the conflicting opinion evidence between Dr. Cox and Dr. Keown, and the latter's observation that plaintiff did not provide reliable efforts during lower extremity range of motion testing (Tr. 372), the undersigned finds the ALJ's rejection of Dr. Cox's opinion to be supported by substantial evidence.

For his final challenge to the ALJ's decision, plaintiff recites the ALJ's explanation for finding his subjective complaints of disabling pain not credible (Tr. 17-18), followed by the argument that "Mr. Boles' allegations of pain are consistent with his level of

daily activity, and the Administrative Law Judge erred in rejecting them. Mr. Boles does little housework[.]" (Docket Entry No. 16 at 21) The ALJ recognized that "[a]lthough [plaintiff] has always lived with his parents, his mother does all of the household and domestic chores," and found that plaintiff had only mild restriction in activities of daily living in light of his report that "he is able to take care of his personal needs independently, cares for a pet dog, and shops." (Tr. 16) Moreover, the ALJ noted other inconsistencies, as follows:

> Mr. Boles utilizes a wooden stick fashioned into a cane, however, there is nothing in the record to indicate any hand held walking device every being prescribed. Although the record indicates he continued to work through 2007, he reported being laid off from his job. The fact that these impairments did not prevent the claimant from working at that time strongly suggests that they would not currently prevent work. The claimant never sought or received treatment from a specialist, and treatment has been essentially routine and/or conservative in nature.
>
> . . .
>
> . . . Specifically, Dr. Keown assessed that even though he complained of bilateral knee pain, he demonstrated excellent mobility, has never required surgery, or demonstrated any radiculopathy. Additionally, with regard to his back pain, Dr. Keown noted he had little to say. The claimant had full range of motion in the cervical and lumbar spine, straight leg raises were negative, and strength in all four limbs was intact at 5/5. This assessment did not indicate a requirement to use a cane. The consultant reported bilateral knee joints were without crepitance, effusion, redness, or warmth and there was no joint swelling, warmth, or atrophy in the hands....

(Tr. 17-19) Dr. Keown further noted inconsistencies between plaintiff's performance on range-of-motion testing and his range of motion when sitting in a chair unscrutinized. (Tr. 372) Moreover, while plainly not activity which plaintiff engaged in daily, he reported in

18

October 2009 that he enjoyed hunting, fishing, boating, and off-road vehicles as hobbies. (Tr. 418)  In all, despite a relatively limited range of daily activities, the record as a whole substantially supports the ALJ's decision to discount the credibility of plaintiff's pain complaints.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 18th day of August, 2014.

 s/ John S. Bryant  
JOHN S. BRYANT  
UNITED STATES MAGISTRATE JUDGE